Sanjay S. Schmidt (SBN 247475)
LAW OFFICE OF SANJAY S. SCHMIDT
1388 Sutter Street, Suite 810
San Francisco, CA 94109
T: (415) 563-8583
F: (415) 223-9717
ss@sanjayschmidtlaw.com

T. Kennedy Helm, IV (SBN 282319)
HELM LAW OFFICE, PC
644 40th Street, Suite 305
Oakland, CA 94609
T: (510) 350-7571
F: (510) 350-7359
kennedy@helmlawoffice.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.P., a minor, by and through her guardian ad litem, Terri Williams Park, individually and as successor in interest to JONAS ALEXANDER PARK, Deceased; and TERRI WILLIAMS PARK, individually,<br><br>vs.<br><br>COUNTY OF ALAMEDA, a municipal corporation; GREGORY J. AHERN, Alameda County Sheriff-Coroner; KARYN L. TRIBBLE, PsyD, LCSW, Director, Alameda County Behavioral Health Care Services Agency; JEFFREY SEAL, M.D., Lead Psychiatrist for Alameda County Behavioral Health Care Services Agency's Adult Forensic Behavioral Health; JENNIFER L. SELLS, Alameda County Sheriff's Sergeant; MARC R. SOPOLOW, LESLIE A. GERBACIO, PRENTICE J. HOWARD, REGINAL D. AARON, RUBEN POLA, Alameda County Sheriff's Deputies; NAPOLEON M. TERRELL, Alameda County Sheriff's Technician; WELLPATH, LLC, a Delaware | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES, AND DEMAND FOR JURY TRIAL** |

1    corporation; KIP HALLMAN, President;   )
     JORGE DOMINICIS, Chief Executive   )
2    Officer; THOMAS PANGBURN, M.D., Chief )
     Clinical Officer; MARIA MAGAT, M.D.,   )
3    Medical Director; SZILVIA MOLITORISZ, )
     M.D., Medical Director; EVELYN HIRSCH, )
4    R.N.; STELLA LEWIS, R.N.; RAJBINDER )
     MAND, L.V.N.; FELICIDAD C. RAMILO,  )
5    L.V.N.; CELA BARRON, R.N.; HARVIN  )
     FERRER, R.N.; ROSALYN WILLIAMS,   )
6    L.V.N.; CHISA EARL, L.V.N.; HECTOR  )
     LUZ, R.N.; HARPREET K. SIDHU, L.V.N.; )
7    JHARANA SHREESH, R.N.; H. SINGH,   )
     R.N.; MICHELL TADEO, L.V.N.;         )
8    individually, and DOES 1–30, individually,  )
     jointly and severally,                )
9                                      )
                   Defendants.         )
10                                      )
11    _____ )

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
      *K.P, et al. v. County of Alameda, et al.*
      Case No.

Plaintiffs, by and through their attorneys, the LAW OFFICE OF SANJAY S. SCHMIDT and HELM LAW OFFICE, PC, for their Complaint against Defendants, state as follows:

## JURISDICTION

1.   This 42 U.S.C. § 1983 civil-rights, wrongful-death, and survival action arises out of Defendants' deliberate indifference to the serious, emergent medical and mental-health needs of JONAS ALEXANDER PARK, a thirty-three-year-old, who had a history of anxiety and bi-polar disorder, and who endured Fentanyl withdrawal and prolonged isolation without appropriate supervision, resulting in his death by suicide, on February 9, 2021, at the COUNTY OF ALAMEDA's Santa Rita Jail. PARK's death was the seventeenth suicide at the Santa Rita Jail since 2014. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and the above-mentioned statutory and constitutional provisions. Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law.

## INTRADISTRICT ASSIGNMENT TO SAN FRANCISCO OR OAKLAND DIVISION

2.   A substantial part of the events and/or omissions complained of herein occurred in the City of Dublin, in Alameda County, California. Pursuant to Civil Local Rule 3-2(d), this action is properly assigned to the San Francisco Division or the Oakland Division of the United States District Court for the Northern District of California.

## PARTIES AND PROCEDURE

3.   Minor Plaintiff K.P. is and was at all times herein mentioned the only biological child of Decedent JONAS ALEXANDER PARK ("PARK") and is a resident of the State of Florida. She is being represented in this matter by her Decedent's mother and her paternal grandmother and proposed Guardian Ad Litem, Terri Williams Park, whose application pursuant to Federal Rule of Civil Procedure 17(c) will either be filed herewith or will be filed shortly thereafter. Minor Plaintiff K.P. brings these claims individually for wrongful death, Cal. Code Civ. Proc. §§ 377.60 *et seq.*,

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

3

1  and as successor in interest for her father, Decedent PARK, pursuant to California Code of Civil
2  Procedure §§ 377.11 and 377.20 *et seq.*, and for violation of her personal rights. A successor-in-
3  interest declaration signed by minor K.P.'s proposed Guardian Ad Litem is filed herewith, or will
4  be filed shortly.

5      4.  Plaintiff TERRI WILLIAMS PARK is the biological mother of Decedent PARK, the
6  paternal grandmother of Minor Plaintiff K.P., and she is a resident of the State of Florida. Plaintiff
7  WILLIAMS brings these claims individually for violations of her personal rights under the First
8  and Fourteenth Amendments to the United States Constitution.

9      5.  Defendant COUNTY OF ALAMEDA ("COUNTY") is a public entity, duly organized
10  and existing under the laws of the State of California. Defendant COUNTY, under its authority,
11  operates the Santa Rita Jail and is and was responsible for ensuring the provision of emergency,
12  medical, and mental-health services to all Santa Rita Jail inmates. Defendant COUNTY is
13  responsible for ensuring that the basic human needs of individuals in its custody are met, and for
14  ensuring that inmates are not at risk of serious harm, including by providing appropriate funding,
15  oversight, and corrective action to ensure adequate conditions. Defendant COUNTY is also
16  responsible for ensuring that jail policies and practices do not violate inmates' constitutional rights
17  or put them at risk of serious harm, including by suicide, because they are unable to properly care
18  for themselves. Defendant COUNTY, by law, possesses the ultimate authority over and
19  responsibility for the medical care, mental-health care, treatment, and physical safekeeping of all
20  incarcerated persons at the Santa Rita Jail, including Decedent JONAS PARK. Defendant
21  COUNTY operates and manages the Alameda County Sheriff's Office ("ACSO"); the Alameda
22  County Behavioral Health Care Services ("BHCS"), and its sub-division, Adult Forensic
23  Behavioral Health ("AFBH"). Defendant COUNTY is and was at all relevant times mentioned
24  herein responsible for the actions and/or inactions and the policies, procedures, and
25  practices/customs of the ACSO, the BHCS/AFBH, and their employees and/or agents.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

4

1    Pursuant to California Government Code § 815.2, the COUNTY is vicariously liable for the state-

2    law torts of its employees and agents, including the individual Defendants herein.

3        6.    Defendant GREGORY J. AHERN ("AHERN"), at all material times, was employed by

4    Defendant COUNTY as Sheriff-Coroner, and was acting within the course and scope of that

5    employment. As Sheriff-Coroner, Defendant AHERN was responsible for the hiring, screening,

6    training, retention, supervision, discipline, counseling, and control of all ACSO custodial

7    employees and/or agents. Defendant AHERN, with the assistance of a small group of executive

8    officers, is and was charged by law with the administration of the Santa Rita Jail. Defendant

9    AHERN also is and was responsible for the promulgation of policies and procedures and allowance

10   of the practices/customs, pursuant to which the acts of the ACSO alleged herein were committed

11   for the COUNTY, and at all material times, he was acting within the course and scope of that

12   employment. Further, Defendant AHERN was ultimately responsible for the provision of medical

13   and mental-health care to inmates at the Santa Rita Jail, and all COUNTY and WELLPATH

14   policies, procedures, and training related thereto. Defendant AHERN is being sued in his

15   individual capacity.

16       7.    Defendant Dr. KARYN L. TRIBBLE, PsyD, LCSW ("TRIBBLE"), at all material times,

17   was employed as the Director of the COUNTY's BHCS/AFBH. As Director, TRIBBLE was

18   ultimately responsible for the provision of mental-health care in the Santa Rita Jail. Defendant

19   TRIBBLE was responsible for the hiring, screening, training, retention, supervision, discipline,

20   counseling, and control of all BHCS/AFBH employees and/or agents of BHCS/AFBH working at

21   the Santa Rita Jail. Defendant TRIBBLE was also responsible for the promulgation of the policies

22   and procedures and allowance of the practices/customs, pursuant to which the acts of the

23   COUNTY alleged herein were committed. Defendant TRIBBLE was acting within the course and

24   scope of this employment at all material times. Defendant TRIBBLE is being sued in her individual

25   capacity.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

5

8.     Defendant JEFFREY SEAL, M.D. ("SEAL"), was at all material times employed as the Lead Psychiatrist of BHCS/AFBH, responsible for providing mental-health care to the inmates at the Santa Rita Jail, including, but not limited to, psychiatric assessment and treatment. Defendant SEAL was, at all relevant times mentioned herein, a supervisor of COUNTY's provision of mental-health services at the Santa Rita Jail through BHCS/AFBH. Defendant SEAL was responsible for ensuring that COUNTY mental-health professionals at the Santa Rita Jail complete adequate and timely mental-health assessments and referrals of patients, and provide appropriate mental-health treatment, including suicide prevention.

9.     Defendant JENNIFER L. SELLS ("SELLS"), at all material times, was employed as a law-enforcement officer (Corrections Sergeant) by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

10.    Defendant MARC R. SOLOPOW ("SOLOPOW"), at all material times, was employed as a law-enforcement officer (Classifications Deputy) by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

11.    Defendant LESLIE A. GERBACIO ("GERBACIO"), at all material times, was employed as a law-enforcement officer (Classifications Deputy) by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

12.    Defendant PRENTICE J. HOWARD ("HOWARD"), at all material times, was employed as a law-enforcement officer (Custodial Deputy) by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

13.    Defendant REGINAL D. AARON ("AARON"), at all material times, was employed as a law-enforcement officer (Custodial Deputy) by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

14.    Defendant RUBEN POLA ("POLA"), at all material times, was employed as a law-enforcement (Custodial Deputy) by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

6

15.   Defendant NAPOLEON M. TERRELL ("TERRELL"), at all material times, was employed as a Sheriff's Technician by Defendant COUNTY's ACSO, and was acting in the course and scope of that employment at all material times.

16.   Defendant WELLPATH, LLC ("WELLPATH"), is a Delaware corporation headquartered in Nashville, Tennessee. Defendant WELLPATH, one of the nation's largest for-profit correctional health-care providers, services about 394 county jails and community facilities, and more than 140 state and federal prisons in about 36 states. The COUNTY has contracted with Defendant WELLPATH and its precursor, California Forensic Medical Group ("CFMG"), to provide medical care, including detoxification treatment, for Santa Rita Jail inmates since 2016.[1]

17.   On information and belief, WELLPATH and their employee and medical directors for WELLPATH's services at the Santa Rita Jail, Defendants MARIA MAGAT, M.D. ("MAGAT"), and SZILVIA MOLITORISZ, M.D. ("MOLITORISZ"), were at all material times responsible for making and enforcing policies, procedures, supervision, and training related to the medical care of inmates at Defendant COUNTY's Santa Rita Jail, including, but not limited to: refusing jail admission for inmates before they have received necessary medical clearance and care from a hospital; assessing inmates for emergency medical needs; sending inmates for emergency medical care; referring inmates to BHCS/AFBH for treatment; and providing appropriate alcohol and drug detoxification and withdrawal care.

18.   On information and belief, WELLPATH and its employees and agents are and were at all material times responsible for making and executing policies, procedures, supervision, and training related to the medical care of inmates at the Santa Rita Jail, including, but not limited to: properly assessing and classifying inmates; properly referring inmates for emergency medical and mental-

---

[1] WELLPATH was created in 2018 from HIG Capital's merging CFMG with another correctional-healthcare company, Correct Care Solutions. From 2016 until 2018, COUNTY contracted with CFMG, owned by HIG Capital as part of its portfolio of correctional-medical group companies. In 2015, the *Sacramento Bee* reported that, over a 10-year period, jails contracting with CFMG had a rate of suicide and drug overdoses 50 percent higher than in non-CFMG serviced county jails in California. *See* https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

7

health care; properly sending inmates for medical clearance before admission to the jail; properly providing appropriate detoxification to manage withdrawal; properly providing an individual treatment plan for each prisoner; and properly assessing the mental-health needs of inmates, including suicide prevention and observation of suicidal and potentially suicidal inmates. Defendants MAGAT, MOLITORISZ, HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, as well as certain DOE Defendants, including, but not limited to, WELLPATH employees and agents acting within the course and scope of their employment with WELLPATH (and within the course and scope of their employment with COUNTY by virtue of WELLPATH's contract with COUNTY) were all responsible for properly sending inmates for emergency medical care and/or obtaining medical clearance before admitting them to the jail; properly assessing and addressing the medical needs of inmates; properly referring inmates with mental-health medical needs to the COUNTY; providing appropriate alcohol and drug detoxification and withdrawal; properly assessing and treating the serious medical needs of inmates; providing appropriate individual treatment plans; and providing appropriate observation and suicide prevention.

19. Defendant KIP HALLMAN ("HALLMAN") was at all relevant times President of WELLPATH. His responsibilities included the promulgation of the policies and procedures and allowance of the practices/customs, pursuant to which the acts and omissions alleged herein were committed. On information and belief, Defendant HALLMAN had knowledge of the deficiencies in policies, procedures, and practices regarding the provision of health care, including opiate and other detoxification treatment, at the Santa Rita Jail, as well as knowledge of the suicides and other deaths at the Santa Rita Jail, and he failed to take reasonable and adequate measures to correct these failures before PARK's death.

20. Defendant JORGE DOMINICIS ("DOMINICIS") was at all relevant times Chief Executive Officer of WELLPATH. His responsibilities included managing overall operations and resources, making major corporate decisions, and driving corporate strategy. On information and

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

8

belief, DOMINICIS had knowledge of the deficiencies in policies, procedures, and practices regarding the provision of health care, including opiate and other detoxification treatment, at the Santa Rita Jail, as well as knowledge of the suicides and other deaths at the Santa Rita Jail, and he failed to take reasonable and adequate measures to correct these failures before PARK's death.

21. Defendant THOMAS PANGBURN, M.D. ("PANGBURN"), was at all relevant times the Chief Clinical Officer for WELLPATH. His responsibilities included communicating between medical staff and administration, and ensuring appropriate care to all patients. On information and belief, PANGBURN had knowledge of the deficiencies in policies, procedures, and practices regarding the provision of health care, including opiate and other detoxification treatment, at the Santa Rita Jail, as well as knowledge of the suicides and other deaths at the Santa Rita Jail, and he failed to take reasonable and adequate measures to correct these failures before PARK's death.

22. Defendant MARIA L. MAGAT, M.D. ("MAGAT"), was, at all relevant times mentioned herein, a physician licensed to practice medicine in the State of California, a managing agent and employee of Defendant WELLPATH, working as a medical director at Defendant COUNTY's Santa Rita Jail, responsible for overseeing and providing medical care to inmates, and acting within the course and scope of that employment. On information and belief, Defendant MAGAT was ultimately responsible for WELLPATH's provision of medical care to inmates at the Santa Rita Jail, including sending inmates for emergency medical care; refusing to admit inmates due to a medical emergency; refusing to admit inmates until they received medical clearance from a hospital; assessing inmates for possible mental-health and emergency-medical needs, including assessing patients for possible suicide risk; instituting appropriate suicide precautions; instituting and supervising appropriate alcohol and drug detoxification and withdrawal; instituting appropriate treatment plans for the serious medical and mental health needs of patients; communicating about a patient's medical and mental-health needs with custodial staff, health-care professionals, and outside facilities; and all WELLPATH policies, procedures, and training related thereto. Defendant MAGAT was at all times responsible for staffing the WELLPATH medical services at the JAIL, including, but not limited to: providing appropriate staff-to-patient ratios, and

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

9

ensuring that only properly licensed and credentialed health-care providers provided care. Defendant MAGAT was also responsible for approving all medical orders and prescriptions for the inmates, including PARK.

23.   Defendant SZILVIA MOLITORISZ, M.D. ("MOLITORISZ"), was, at all relevant times mentioned herein, a physician licensed to practice medicine in the State of California, a managing agent and employee of Defendant WELLPATH, working as a medical director at Defendant COUNTY's Santa Rita Jail, responsible for overseeing and providing medical care to prisoners and detainees, and acting within the course and scope of that employment. On information and belief, Defendant MOLITORISZ was ultimately responsible for WELLPATH's provision of medical care to inmates at the Santa Rita Jail, including sending inmates for emergency medical care; refusing to admit inmates due to a medical emergency; refusing to admit inmates until they received medical clearance from a hospital; assessing inmates for possible mental-health and emergency-medical needs, including assessing patients for possible suicide risk; instituting appropriate suicide precautions; instituting and supervising appropriate alcohol and drug detoxification and withdrawal; instituting appropriate treatment plans for the serious medical and mental health needs of patients; communicating about a patient's medical and mental-health needs with custodial staff, health-care professionals, and outside facilities; and all WELLPATH policies, procedures, and training related thereto. Defendant MOLITORISZ was at all times responsible for staffing the WELLPATH medical services at the JAIL, including, but not limited to: providing appropriate staff-to-patient ratios, and ensuring that only properly licensed and credentialed health-care providers provide care. Defendant MOLITORISZ was also responsible for approving all medical orders and prescriptions for the prisoners, including PARK.

24.   Defendant EVELYN HIRSCH, R.N. ("HIRSCH"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. Defendant HIRSCH performed the initial medical screening on PARK when he was booked, and she failed to obtain a medical clearance for PARK before admitting him to the Santa

Rita Jail; failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency, requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

25. Defendant STELLA LEWIS, R.N. ("LEWIS"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. As set forth below, Defendant LEWIS failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency, requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

26. Defendant RAJBINDER MAND, L.V.N. ("MAND"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant MAND failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency, requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

27. Defendant FELICIDAD C. RAMILO, L.V.N. ("RAMILO"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment.

As set forth below, Defendant RAMILO failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

28.  Defendant CELA BARRON, R.N. ("BARRON"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant BARRON failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

29.  Defendant HARVIN FERRER, R.N. ("FERRER"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant FERRER failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; and, failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

12

30. Defendant ROSALYN WILLIAMS, L.V.N. ("WILLIAMS"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant WILLIAMS failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

31. Defendant CHISA EARL, L.V.N. ("EARL"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant EARL failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

32. Defendant HECTOR LUZ, R.N. ("LUZ"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant LUZ failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient

detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

33.  Defendant HARPREET K. SIDHU, L.V.N. ("SIDHU"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant SIDHU failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

34.  Defendant JHARANA SHREESH, R.N. ("SHREESH"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant SHREESH failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

35.  Defendant H. SINGH, R.N. ("SINGH"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant SINGH failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

14

medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

36.  Defendant MICHELL TADEO, L.V.N. ("TADEO"), was at all material times employed by Defendant WELLPATH, and acted within the course and scope of that employment. As set forth below, Defendant TADEO failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to monitor PARK's symptoms by regular assessments (CIWA or COWS); and, failed to inform any physician or mid-level provider about PARK's deteriorating and serious medical condition and serious medical needs, despite PARK's obvious medical and/or mental-health emergency requiring immediate transfer to a hospital for inpatient detoxification and psychiatric treatment, with deliberate indifference to PARK's serious medical needs.

37.  Despite Plaintiffs' counsel's multiple requests for records, Defendants have not provided Plaintiffs' counsel with unredacted documents, existing body-worn camera videos, and other information concerning this incident. Plaintiffs are, therefore, ignorant of the true names and capacities of Defendants DOES 1–30, and, thus, sue these Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiffs will amend their Complaint to state the names and capacities of each DOE Defendant, when they have been ascertained.

38.  Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise, specifically alleged.

39.   At all material times, each Defendant was jointly engaged in tortious activity, and was an integral participant in the events and violations of rights described herein, resulting in the deprivation of Decedent's and Plaintiffs' constitutional rights and other harm.

40.   The acts and omissions of Defendants were at all material times pursuant to the actual customs, policies, practices, and procedure of the COUNTY and WELLPATH, as set forth herein.

41.   At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

42.   Plaintiffs timely and properly filed a government code claim, pursuant to California Government Code § 910 *et seq*., and this action is timely filed within all applicable statutes of limitation.

43.   This Complaint may be pleaded in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

44.   Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

## I.   RESTRICTIVE HOUSING AND INMATE SUICIDES AT SANTA RITA JAIL

45.   Between 2014 and January 2022, 57 people died at the COUNTY's Santa Rita Jail.[2] Santa Rita Jail has a 50-percent higher death rate than the Los Angeles County Jail, which is six times its size.[3] According to the United States Department of Justice-Civil Rights Division, "[f]rom 2015 through 2019, there were at least 14 suicides in the Jail, which equates to a rate of suicides that is more than twice the national average."[4] The Department of Justice observed that, "[e]leven of the

---

[2]  Lisa Fernandez, *Ist in-custody death of 2022 occurs at Santa Rita Jail* (Jan. 6, 2022), https://www.ktvu.com/news/1st-in-custody-death-of-2022-occurs-at-santa-rita-jail.
[3]  Lisa Fernandez, *Death rate at Santa Rita exceeds nation's largest jail system as critics call for reform* (Oct. 1, 2019), https://www.ktvu.com/news/death-rate-at-santa-rita-exceeds-nations-largest-jail-system-as-critics-call-for-reform.
[4]  United States Department of Justice, *Notice Regarding Investigation of Alameda County John George Psychiatric Hospital, and Santa Rita Jail*, (Apr. 22, 2021), https://www.justice.gov/crt/case-document/file/1388891/download.

14 people who died by suicide between 2015 and 2019 were held in restrictive housing at some point," and "half of the other instances of self-harm . . . occurred while prisoners were in restrictive housing."[5]

46.   The COUNTY uses isolation or "restrictive housing" to manage its inmates with mental-health needs. As the United States Department of Justice, Civil Rights Division, described in its report finding that the Santa Rita Jail's restrictive housing practice violated the constitutional rights of the inmates:

> Restrictive housing, sometimes referred to as solitary confinement, segregation, or isolation, is any type of detention that involves three basic elements: removal from the general prisoner population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; and the inability to leave the room or cell for the vast majority of the day.[6]

47.   At the Santa Rita Jail, when prisoners on restrictive housing "are permitted to leave their cells, they do so alone—with no opportunity to interact with others—and are still confined to the common indoor pod space. They may not go outdoors."[7]

48.   The conditions in restrictive housing, including little to no out-of-cell time, significantly increase the risk that inmates with psychiatric disabilities will have their condition decompensate when placed in restrictive housing. Over the last several decades, mental-health and correctional experts have documented the harmful effects of prolonged isolation, including: anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors. Prolonged isolation worsens existing psychiatric disabilities and can cause inmates without psychiatric disabilities *to develop them*. Because of the risks posed by isolation to inmates with psychiatric disabilities, a consensus has been reached in mental-health correctional communities that inmates with psychiatric disabilities should only be placed in restrictive housing if absolutely necessary. In addition, if prisoners with mental illness are placed in restrictive housing, they must be monitored

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

closely, and they must be provided with significant structured and unstructured out-of-cell time.

49.  Placement in restrictive housing imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. Defendants failed to provide process adequate to protect that liberty interest. Despite the harmful and punitive conditions in the Santa Rita Jail, Defendants lack an effective, accurate classification system to determine who gets placed in restrictive housing. Inmates are held in restrictive housing indefinitely. Defendants assign inmates to restrictive housing based on their classification as mentally ill.

50.  Defendant COUNTY's policies and practices for mental-health screening and tracking are inadequate. Defendant COUNTY fails to adequately identify, track, and treat the mental-health problems of newly arriving inmates with psychiatric disabilities during the screening and intake process. Defendant COUNTY's failure to identify and initiate adequate mental-health treatment via the Santa Rita Jail's intake process places inmates arriving at the Santa Rita Jail with psychiatric disabilities at a risk of serious harm, including suicide and death.

51.  When an inmate is newly booked into the Santa Rita Jail, the first step of the intake process involves custody staff completing a brief one-page general health screening form, called a Medical Intake Triage/Receiving Screening form, through a cursory interview conducted with the inmate in a non-confidential area of the Santa Rita Jail. On information and belief, many questions contained on the form are frequently not asked during the intake process, including those about mental-health history and other basic and essential data necessary to identify prisoners in need of mental-health care, including those at risk of self-harm.

52.  After the initial screening, newly booked inmates are typically interviewed by a WELLPATH employee. Mental-health staff from Defendant COUNTY's BHCS-AFBH play no role in this process. Mental-health staff from Defendant COUNTY'S BHCS-AFBH only evaluate inmates at intake if the WELLPATH or ACSO employee who completes the intake assessment forms refers the inmate to BHCS-AFBH mental-health staff. Defendant WELLPATH's staff

1  frequently fails to refer inmates to Defendant COUNTY's BHCS-AFBH, even when the inmate
2  discloses an active psychiatric disability. When they occur at all, intake evaluations by Defendant
3  COUNTY's BHCS-AFBH staff frequently do not take place until days or weeks after a prisoner
4  is booked into the Santa Rita Jail. Even when inmates disclose a psychiatric disability to ACSO or
5  WELLPATH staff, the COUNTY has a custom of not appropriately following-up with the inmate,
6  and some inmates with psychiatric disabilities may never be seen by mental-health staff at all. As
7  a result, inmates with psychiatric disabilities are either denied care, or their care is delayed, putting
8  them at increased risk of serious harm, including serious injury or death.

9      53. Since at least 2014, Defendant COUNTY has failed to maintain in its employment or
10  otherwise ensure that there are sufficient numbers of mental-health care professionals to provide
11  minimally adequate care to the approximate 3,000 inmates in the Santa Rita Jail. The chronic
12  understaffing of mental-health staff at the Santa Rita Jail exacerbates the problems caused by
13  inadequate mental-health treatment because the existing mental-health staff cannot timely respond
14  to inmate referrals for psychiatric evaluations and treatment, cannot adequately screen, track,
15  monitor, and provide follow-up care to inmates who are suffering from serious mental-illness, and
16  cannot provide adequate group and individual therapy. BHCS-AFBH's staffing levels result in
17  delayed response to referrals, and in brief, superficial clinical contacts, and result in patients not
18  being seen in the frequency required. Additionally, clerical staffing allocations and vacancies have
19  resulted in very high workloads and turnover of staff, which has negatively impacted patient care.
20  In short, Defendant COUNTY has not provided sufficient mental-health clinical, supervisory, and
21  clerical staffing levels to meet its constitutional obligations and its program demands.

22      54. Defendant COUNTY has also failed to ensure that requests for care reach mental-health
23  care staff in a timely manner, if at all. On information and belief, there has been no policy in place
24  to ensure that ACSO and Defendant WELLPATH staff refer inmate requests for mental-health
25  treatment to Defendant COUNTY's BHCS-AFBH staff. As a result, inmates with psychiatric
26  disabilities are not timely seen or adequately treated.

27
28  COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                                   19
    *K.P. v. County of Alameda, et al.*
    Case No.

55.   By custom and policy, there is poor coordination of care for inmates with psychiatric disabilities. On information and belief, Defendants do not track the number of inmates with psychiatric disabilities or their specific housing locations and/or disability-related needs.

56.   On information and belief, by custom and policy, neither Defendant WELLPATH's staff, nor Defendant COUNTY's ACSO staff, are adequately trained to recognize signs and symptoms of mental illness, and are not adequately trained to refer inmates who exhibit such signs and symptoms to Defendant COUNTY's BHCS-AFBH staff. As a result, Defendant WELLPATH's and Defendant COUNTY's ACSO staff fail to make appropriate referrals, and, consequently, inmates who exhibit symptoms of mental illness are not timely treated.

57.   Defendant COUNTY fails to identify, treat, track, and supervise inmates who are at risk for suicide.

58.   Defendant COUNTY's and WELLPATH's policies and practices for screening, supervising, and treating prisoners at risk for suicide are inadequate.

59.   On information and belief, Defendant COUNTY has a custom of not adequately training ACSO staff to identify inmates who are at risk of suicide and to respond appropriately to inmates who are exhibiting suicidal tendencies, putting them at increased risk of harm. This is especially problematic, because ACSO staff, both during the intake process and for the duration of an inmate's time at the Santa Rita Jail, are primarily responsible for alerting mental-health staff when an inmate is suicidal.

60.   Defendant COUNTY has a custom of routinely failing to sufficiently observe inmates who have been identified as being at risk of suicide. Specifically, Defendant COUNTY lacks any policy or procedure for, and, thus, fails to provide, constant observation of inmates who are actively suicidal,  including those that are either threatening to or engaging in the act of suicide.

61.   Defendant COUNTY's policy for conducting "safety checks" is inadequate to ensure the safety of inmates with serious mental illness in restrictive housing. Defendant COUNTY has a policy requiring safety checks once every half-hour, but ACSO staff fail to follow this policy, and

frequently fail to conduct appropriate checks at intermittent and unpredictable times. Defendant COUNTY's policy concerning the performance of "safety checks" is perfunctory and does not include direct visual observation that is sufficient to assess the inmate's well-being and behavior. Defendant COUNTY's policy of "safety checks" fails to use verbal interaction as a part of the "safety checks", even when visual observation of the inmate is obscured or circumstances otherwise demonstrate a reason for concern about the inmate's well-being and behavior. As a result, inmates in restrictive housing are put at an increased risk of harm.

62.  Defendant COUNTY and AHERN have failed to provide enough Sheriff's Technicians in the Housing Control Points, a critical post for observing inmates to ensure their safety. There is only a single Sheriff's Technician assigned to each Housing Unit Control Point, and not having sufficient staff in each Housing Control Point creates an unreasonable risk of harm to inmates.

63.  Defendant COUNTY has a custom of routinely failing to eliminate the suicide hazard posed by bunk beds and bedsheets, despite these materials having been used repeatedly in suicides at the Santa Rita Jail. The bunk beds are an easy hanging point and have been used by inmates to attempt and commit suicide at the Santa Rita Jail, and even inmates specifically placed on suicide watch are left alone in cells with bunk beds, and are given sheets. Defendant COUNTY routinely gives bedsheets to inmates on suicide watch, and the bedsheets have been used by inmates to attempt and also successfullly commit suicide at Santa Rita Jail.

64.  Defendant COUNTY has knowledge of the substantial risk of harm caused by inadequate suicide prevention and treatment policies and practices in the Santa Rita Jail, but has failed to take steps to prevent, or even to diminish, the harmful effects of these unlawful policies and practices. Defendant COUNTY is, thus, deliberately indifferent to the risk of harm to inmates created by the COUNTY's failure to operate a constitutionally adequate suicide-prevention and treatment program.

65.  Defendant COUNTY's ACSO also has a custom of failing to provide sufficient staff to enable inmates to access mental-health services and other programs available at the Santa Rita Jail,

because not enough deputies are available to escort mental-health professionals to inmates for treatment, including on their unit or at their cell door.

66. Defendants COUNTY, AHERN, TRIBBLE, SEAL, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1–30 knew before JONAS PARK's death that at least 10 jail suicides occurred between 2014–2017, which were caused by the COUNTY's and WELLPATH's customs and practices of putting mental-health inmates in restrictive housing, not providing sufficient mental-health diagnosis or treatment; not providing a constitutionally adequate suicide-prevention and treatment program; improperly addressing the opiate-detoxification needs of inmates; and failing to properly monitor inmates, especially those at risk of self-harm:

    a.    On February 10, 2014, Yanet Diaz, a Santa Rita inmate housed alone in restrictive housing, classified as a "mental-health inmate," suffered an anoxic brain injury and later died after she committed suicide by strangulation using a telephone cord while in a holding cell – which is overseen by the COUNTY's ACSO, and for which the ACSO is responsible – at the Alameda County Superior Court in Fremont.[8]

    b.    On March 6, 2014, Kevin Mark Hurd, housed alone in restrictive housing as an administrative-segregation inmate, died three days after his booking into the Jail after he committed suicide by hanging from a noose made out of his Jail bedsheet.[9]

    c.    On June 3, 2014, Duoc Van Chau, housed alone in restrictive housing as a mental-health, administrative-segregation inmate, died after he committed suicide by hanging in a holding cell using a County-issued T-shirt.[10]

---

[8] Lisa Fernandez, *A look at the 45 inmates who have died at Santa Rita Jail in the last five years*, ktvu.com (Oct. 4, 2019; updated Nov. 18, 2020), https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years.
[9] *Id.*
[10] *Id.*

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

22

d.      On December 6, 2014, Eric Steven Bueno, housed alone in restrictive housing, died three days after his booking into the Jail after he committed suicide by hanging using his bed sheets; he was found to have had methamphetamine in his system.[11]

e.      On March 3, 2015, Gary Clee Oldham, housed alone for 24-hours a day, with no out-of-cell time, died after he committed suicide by hanging using a bedsheet on February 21, 2015.[12]

f.      On February 8, 2015, Michael Anthony Brown, an administrative segregation inmate housed alone in restrictive housing, committed suicide by hanging/asphyxiation from his upper bunk. He had covered his cell window with cardboard.[13]

g.      On June 19, 2015, Christopher Luis Daniel Angulo, a mental-health inmate housed alone in restrictive housing, committed suicide by slitting his right arm and hemorrhaging to death.[14]

h.      On December 10, 2015, John Jeffrey Bonardi, a protective-custody inmate housed alone in restrictive housing, died of suicide by hanging/asphyxiation, after using the top bunk and a ligature to commit suicide.

i.      On July 15, 2016, Balvir Singh, a mental-health inmate housed alone in restrictive housing,  committed suicide by hanging/asphyxiation, using a bed sheet, while his cell mate was alone.[15]

j.      On October 30, 2016, Barry Heisner Jr., housed alone in restrictive housing, committed suicide by hanging/asphyxiation.[16]

67.   In 2016, on information and belief, an American Correctional Association ("ACA") audit of the Santa Rita Jail referenced a lack of timely security checks. On information and belief,

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

1    Defendant COUNTY and AHERN have a custom and practice of leaving Sheriff's Deputy and

2    Sheriff's Technician positions vacant, so there are not enough deputies or Sheriff's Technicians to

3    conduct appropriate safety checks on inmates, especially those on suicide watch.

4        68.   In January 2017, the United States Department of Justice-Civil Division notified

5    COUNTY and AHERN of its investigation into whether the conditions of confinement at Santa

6    Rita Jail "subjected individuals to unlawful harm."[17] Over the next four years, two nationally

7    recognized expert consultants assisted the DOJ with its investigation—a forensic psychiatrist with

8    over 20 years of clinical and forensic experience in a variety of academic and correctional settings,

9    and a community psychiatrist with experience both as a medical director of a statewide

10   community-services provider and as a bureau chief for a state mental health authority.[18] These

11   experts accompanied the DOJ on site visits, participated in interviews with County and facility

12   staff and community members, reviewed documents, and provided their expert opinions and

13   insight to help inform the DOJ's investigation and its conclusions.[19] At the conclusion of these site

14   visits, the Department of Justice provided Santa Rita Jail officials, including, but not limited to,

15   Defendant AHERN, with exit briefings, during which the experts "shared their preliminary

16   observations," and "expressed their opinions that mental health care for prisoners with serious

17   mental health needs was deficient, and specified the various areas in which such care was

18   inadequate."[20]

19       69.   Defendants COUNTY, AHERN, TRIBBLE, SEAL, HALLMAN, DOMINICS,

20   PANGBURN, MAGAT, MOLITORISZ, and DOES 1–30 knew before JONAS PARK's death of

21   the suicides and related litigation, inter alia, that continued after 2017, which were caused by the

22   COUNTY's and WELLPATH's customs and practices of putting mental-health inmates in

---

[17] United States Department of Justice, *Notice Regarding Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail* (Apr. 22, 2021), https://www.justice.gov/crt/case-document/file/1388891/download.
[18] *Id.*
[19] *Id.*
[20] *Id.*

restrictive housing, not providing sufficient mental-health diagnosis or treatment, not providing a constitutionally adequate suicide-prevention and treatment program, and improperly and inadequately addressing the opiate-detoxification needs of inmates:

a.　On October 26, 2017, Miguel Gomez, housed alone in Housing Unite 23, committed suicide by hanging/asphyxiation by using his bedsheet as a ligature device, after other inmates had told correctional deputies that Gomez was suicidal.[21]

b.　On November 29, 2017, Edwin Alexander Villalta, housed alone in a cell and classified as an administrative segregation inmate, committed suicide by hanging/asphyxiation from the upper bunk.[22]

c.　On April 8, 2018, Logan McKinley Masterson, who suffered from substance-abuse and mental-health issues and was classified as an administrative segregation inmate and put on restrictive housing, committed suicide by hanging himself with a bed sheet.[23] The incident resulted in a lawsuit by Masterson's heirs against the COUNTY, AHERN, and WELLPATH's predecessor corporation, CFMG, *Masterson, et al. v. County of Alameda, et al.*, No. 4:19-cv-1625-PJH (N.D. Cal.), which resolved in April of 2021.

d.　On June 10, 2019, twenty-year-old Christian Madrigal committed suicide by hanging himself in an isolation cell using chains the Deputies left in the cell.[24] His stepfather and mother brought a wrongful-death, § 1983 civil-rights lawsuit against Defendant COUNTY, *Jaime, et al. v. County of Alameda, et al.*, No. 3:19-cv-08367-SI (N.D. Cal.), which was resolved, in October 2020.

---

[21] Lisa Fernandez, *A look at the 45 inmates who have died at Santa Rita Jail in the last five years*, ktvu.com (Oct. 4, 2019; updated Nov. 18, 2020), https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years.
[22] *Id.*
[23] *Id.*
[24] *Id.*

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

25

e.       On July 6, 2019, Christopher Dean Thomas, who had a history of drug problems and was housed alone, died by anoxic encephalopathy and hanging, having been found suspended with a noose fashioned from a bedsheet around his neck.[25]

f.       On or about July 24, 2019, Raymond Christopher Reyes, Jr., who had a history of drug problems and mental-health issues, spent 19 days in isolation before he died by hanging.[26] Mr. Reyes's parents and minor child sued Defendants COUNTY and WELLPATH, *Reyes, et al. v. County of Alameda, et al.*, No. 4:20-cv-03971-DMR (N.D. Cal.), which suit was later resolved.

g.       On December 4, 2019, Christopher Crosby, who was on suicide watch, committed suicide by asphyxiation with a plastic bag.[27] His mother and his minor child sued Defendants COUNTY and WELLPATH, *Crosby, et al., v. County of Alameda, et al.*, No. 3:20-cv-08529-MMC (N.D. Cal).

70.   Moreover, on December 21, 2018, a class-action, civil-rights lawsuit seeking injunctive relief, *Babu v. Cnty. of Alameda*, 5:18-cv-07677-NC (N.D. Cal. Apr. 22, 2020), was filed against COUNTY and AHERN, over the "broken" Santa Rita Jail system, "especially when it comes to the way it treats people with psychiatric disabilities." Dkt. 1 at 1:2-3. According to the Complaint:

> Alameda County relies almost entirely on the unconstitutional use of isolation to manage prisoners, including prisoners with significant . . . mental health needs, resulting in horrific suffering. Alameda County's use of isolation has had tragic consequences, and over the last five years, at least thirty-three individuals incarcerated in the Alameda County Jails have died, including thirteen individuals who committed suicide with many more unsuccessful attempts. These deaths are not isolated tragedies but rather are indicative of the harsh and unconstitutional conditions in the [Santa Rita Jail]. Dkt. 1 at 1:4-10.

71.   While there were no suicides in 2020, two more suicides occurred at the Santa Rita Jail in the first four months of 2021, of which JONAS PARK's was the first.

---

[25] *Id.*
[26] *Id.*
[27] *Id.*

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

26

1

2

## II. JONAS PARK'S INTAKE AT THE SANTA RITA JAIL INDICATED HE HAD SERIOUS AND EMERGENT MEDICAL AND MENTAL-HEALTH NEEDS

3   72. On February 3, 2021, at 9:20 p.m., JONAS PARK was arrested on a warrant for four

4   charges: a felony charge of violating California Penal Code § 459 (burglary); a felony charge of

5   violating California Penal Code § 463(a) (looting); a misdemeanor charge of violating of

6   California Penal Code § 466 (possession of burglary tools); and a misdemeanor charge of violating

7   California Health & Safety Code § 11364(a) (possession of an opium pipe or any device used for

8   smoking a controlled substance). PARK was a pretrial detainee, at the time of his death in

9   COUNTY's jail.

10   73. PARK had a long history of psychiatric disability and mental-health illness, including

11   anxiety and bi-polar disorder. PARK also had a long history of substance abuse, including abuse

12   of multiple substances at the same time, and he suffered from opiate use disorder.

13   74. At 1:20 a.m., on February 4, 2021, PARK was booked into the Santa Rita Jail. At about

14   2:02 a.m., Defendant HIRSCH noted that PARK drank "Wine: Bottle a day" and took "Xanax 2

15   bars/daily—Oral;" smoked Fentanyl – "2–3 gms/daily;" and smoked "Meth 1 gm/daily[;]"

16   Defendant HIRSCH further noted that PARK last used drugs on February 3, 2021, the day before,

17   and that he had used daily for over a year.

18   75. PARK's urine sample, which was taken hours later by Defendant HIRSCH, would show

19   PARK had positive results for the following substances: Fentanyl; Ecstasy/MDMA;

20   Amphetamine/AMP; Benzodiazepine; and, Methamphetamine. Defendant HIRSCH also noted

21   that PARK had a prior incarceration at the Jail, on July 15, 2020, where it was noted that he

22   suffered from anxiety, and on information on belief was under the influence of Fentanyl, Xanax,

23   Heroin, and Methamphetamine.

24   76. Defendant HIRSCH noted that PARK was actively withdrawing and was at "risk for harm

25   d/t drug and alcohol use." Defendant HIRSCH also noted that PARK had prior withdrawal

26

27

28

experience, which included tremors and seizures, as well as nausea, vomiting, diarrhea, sweat chills, incontinence, and hallucinations.

77.  Defendant HIRSCH noted the following "Alerts" for PARK, set to never expire: "Chronic Care," "Suicide Watch" and "Active Withdrawal."

78.  Defendant HIRSCH administered a drug-abuse screening test (DAST 10) to PARK, who scored 9–10, meaning that he had a "severe level" of problems related to drug abuse.

79.  Defendant HIRSCH suggested that PARK be referred "for DSM-5 Diagnostic Interview", and she noted that a referral to mental-health care for him should be "Emergent (Today)."

## III.   DEFENDANTS FAILED TO ENSURE PARK'S IMMEDIATE REFERRAL FOR APPROPRIATE OPIATE-WITHDRAWAL AND MENTAL-HEALTH TREATMENT

80.  Defendant HIRSCH noted that PARK was "currently withdrawing." A task was supposed to generate for the "MAT/OTP" coordinator based on this response, and Defendant HIRSCH noted that a referral to a "MAT/OTP Coordinator" should be "Emergent (Today)."

81.  Medication Assisted Treatment, known as "MAT," uses medications, in combination with counseling and behavioral therapies, to provide a "whole-patient" approach to substance-use-disorder treatment. Clinically driven and tailored to meet each patient's needs, MAT programs treat addiction to opioids, such as heroin and prescription pain relievers that contain opiates, as well as synthetic opiates, such as Fentanyl. MAT's prescribed medication normalizes brain chemistry, blocking the euphoric effects of opioids, relieving physiological cravings, and normalizing body functions without the opioid's negative and euphoric effects. According to the American Society of Addiction Medicine, medication treatment for opiate withdrawal should include either an opiate agonist, such as buprenorphine or methadone, or an antagonist, such as

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

28

1    naltrexone. These medications work by interacting with the opioid receptors on the surface of brain

2    cells.[28]

3        82. MAT is required treatment because "[i]ndividuals with Opiod Use Disorder often

4    experience debilitating symptoms when undergoing opioid withdrawal—including uncontrolled

5    pain and psychological distress—that may trigger suicidal ideation, especially during the first week

6    of incarceration, if not properly treated."[29] A jail fails to protect inmates from harm where it fails

7    to provide MAT "to individuals at a significant risk of harm from opioid withdrawal."[30]

8        83. "OTP" stands for "Opioid Treatment Program," defined as "a program or practitioner

9    engaged in opioid treatment of individuals with an opioid agonist medication."[31] Moreover,

10   "[f]ederal regulations define opioid treatment as 'the dispensing of an opioid agonist treatment

11   medication, along with a comprehensive range of medical and rehabilitative services, when

12   clinically necessary, to an individual to alleviate the adverse medical, psychological or physical

13   effects incident to opiate addiction.'"[32]

14       84. Despite Defendant HIRSCH's notation for an Emergent (Today) referral for PARK to

15   "MAT/OTP," no Defendant referred PARK for MAT or OTP treatment, nor was there a referral

16   for similar treatment, and no Defendant provided MAT or OTP treatment, nor similar treatment,

17   to PARK, with deliberate indifference to his serious medical needs.

18       85. At no time before his death did Defendants ensure that PARK received a "DSM-5

19   Diagnostic Interview," or any mental-health care, with deliberate indifference to PARK's serious

20   medical and psychiatric needs.

21

22

23   _____

[28] United States Department of Justice, *Investigation of the Cumberland County Jail (Bridgeton, New Jersey)* (Jan. 14, 2021) https://www.justice.gov/opa/press-release/file/1354646/download.

24   [29] *Id.*

[30] *Id.*

25   [31]https://www.jointcommission.org/accreditation-and-certification/health-care-

26   settings/behavioral-health-care/facts-about-opioid-treatment-program-otp-accreditation/

[32] *Id.*

27

1

2

### IV.    WELLPATH DEFENDANTS INCREASED THE RISK OF HARM TO PARK BY GIVING PARK LIBRIUM

3

4

5

6

7

86. On February 4, 2021, between 2:58 a.m. and 3:00 a.m., Defendant HIRSCH set the following, additional "Alerts" for Park, with the following expiration dates: "Active Withdrawal," expiring "02/15/21 at 02:06"; "Meth Intoxication Monitoring," expiring "02/08/2021 00:00"; "Benzo Withdrawal Monitoring," expiring on "02/16/2021 00:00"; and, "COWS Level 0," set to expire "02/08/2021 00:00."'

8

9

10

11

87. On February 4, 2021, at 3:41 a.m., by telephone order, Defendant HIRSCH told Defendant MAGAT that JONAS PARK's "UTOX," or urine screen, had tested positive for "Opiate, Benzo, synthetic, Fentanyl use." Nevertheless, Defendant HIRSCH sought approval from Defendant MAGAT for the following treatments for JONAS PARK:

12

      a.     CIWA TID x 14 day for BENZO

13

      b.     COWS: Monitoring BID X 5 DAYS

14

      c.     CHRONO: LB/LT X 14 for BENO detox

15

      d.     SYNTH OD X 5 DAYS

16

17

18

      e.     Librium, 25 mg cap, 2 caps (50 mg) PO TID detox timing (0500, 1300, 2100) on day 1, 2, and 3. Librium 24 cap, 2 caps (50 mg) PO BID detox timing (0600, 2100) on day 4 and 5.

19

20

21

22

23

24

88.   This order did not address PARK's opiate withdrawal, and in fact contributed further to his risk of self-harm because the order was for alcohol withdrawal—not opiate (fentanyl) withdrawal. In January 2021, The United States Department of Justice, Civil Rights Division had concluded that a jail had departed from the standard of care where it employed "a withdrawal protocol . . . designed for alcohol—not opiate—withdrawal, placing individuals using opiates at the time of their booking into the [jail] at heightened risk for severe symptoms of withdrawal,

25

26

27

28

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL         30
*K.P. v. County of Alameda, et al.*
Case No.

1    including increased anxiety and depression that was a contributing factor in each of the six suicides

2    from 2014 through 2017."[33]

3    89.  The United States Department of Justice-Civil Rights Division has found that a jail likely

4    contributes to suicides of actively withdrawing inmates where it treats "*opiate* withdrawal with a

5    protocol designed to address *alcohol* withdrawal," and prescribes "Librium—a medication to treat

6    alcohol withdrawal—regardless of the drug an inmate was using."[34]

7    90.  It is also well-known that benzodiazepines like Librium increase aggression and impair

8    behavioral inhibition; that a positive correlation exists between prescribed benzodiazepines and

9    attempted or completed suicide; that benzodiazepines are not as effective at managing anxiety as

10   antidepressants and antipsychotics, which do not correlate with suicide or are associated with a

11   lower suicide rate; and that, if prescribed, the discontinuation, reduction in dosage, or missed doses

12   of Librium may lead to exacerbation of anxiety.

13   91.  At 11:13 a.m., on February 4, 2021, Defendant MAGAT denied the order for Librium.

14   Nevertheless, from February 5, 2021, to February 9, 2021, Defendants HIRSCH, BARRON,

15   FERRER, MAND, WILLIAMS, SIDHU, TADEO, SHREESH, and SINGH gave JONAS PARK

16   less than the prescribed amount of Librium, in varying amounts, while noting about five times in

17   JONAS PARK's Medication Administration Record (MAR) that his prescription for Librium had

18   "expired." Defendants HIRSCH, BARRON, FERRER, MAND, WILLIAMS, SIDHU, TADEO,

19   SHREESH, and SINGH gave a contraindicated controlled substance, Librium, to PARK without

20   having an approved physician's order, with deliberate indifference to PARK's serious medical

21   needs.

22   92.  Defendants HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS,

23   EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, and DOES 1–30 also failed to properly

24   monitor PARK. Defendant HIRSCH had recommended that "CIWA TID x 14 day for BENZO"

---

[33] United States Department of Justice, *Investigation of the Cumberland County Jail (Bridgeton, New Jersey)* (Jan. 14, 2021) https://www.justice.gov/opa/press-release/file/1354646/download.
[34] *Id.*

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                                31
*K.P. v. County of Alameda, et al.*
Case No.

occur. Between 02/04/2021 and 02/09/2021, therefore, JONAS PARK needed to have been assessed using the CIWA-Ar Score Sheet three times a day, on 02/04, 02/05, 02/06, 02/07, 02/08, and 02/09, for a total of 18 assessments. Instead, during this period, JONAS PARK was seen by WELLPATH employees 14 times, and at no time did any of Defendants HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, or DOES 1–30 complete the CIWA-Ar Score Sheet; instead, they merely recorded JONAS PARK's vital signs.

93. Nor did Defendants HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, or DOES 1–30 ensure that "COWS: Monitoring BID X 5 DAYS" occurred. COWS stands for "Clinical Opiate Withdrawal Scale," and consists of a flow-sheet for measuring symptoms for opiate withdrawal over a period of time. "The COWS (Clinical Opiate Withdrawal Scale) Score was developed to assist clinicians in quantifying the degree of opiate withdrawal during their patient assessments."[35] Defendants HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, and DOES 1–30 failed to complete any COWS assessments for JONAS PARK while he was in custody, with deliberate indifference to his serious medical needs and pain and suffering.

**V.   THE COUNTY DEFENDANTS PUT JONAS PARK IN RESTRICTIVE HOUSING, AND THEN FAILED TO PROVIDE HIM WITH MENTAL-HEALTH TREATMENT OR SUICIDE PREVENTION AND MONITORING, CULMINATING IN HIS SUICIDE.**

94. In her initial intake, Defendant HIRSCH indicated that PARK could be housed in the General Population.

95. On February 3, 2021, Defendant SOLOPOW interviewed PARK and wrote a classification report, assigning him to Housing Unit 22. On information and belief, Defendant SOLOPOW,

---

[35] https://reference.medscape.com/calculator/530/cows-score-for-opiate-withdrawal

1    contrary to generally accepted standards in jail and prison classification, assigned PARK to a single
2    cell, in restrictive housing.

3    96.  On February 6, 2021, Defendant GERBACIO interviewed JONAS PARK, and wrote a
4    classification report, reassigning him to be housed alone in Housing Unit 23, where JONAS PARK
5    was moved to the same day. On information and belief, Defendant GERBACIO, contrary to
6    generally accepted standards in jail and prison classification, assigned PARK to a single cell, in
7    restrictive housing.

8    97.   While at Housing Unit 23 ("HU 23"), Defendants SELLS, HOWARD, AARON, POLA,
9    TERRELL, and DOES 1-30 offered 30 minutes of out-of-cell time to inmates on a rolling basis,
10   half an hour, in numerical order, and "one at a time," so that only one prisoner could come out of
11   a cell in HU 23 at a time. If an inmate were to reject the opportunity to leave his cell during his
12   "allotted time," the recreation would then be offered to the next inmate in line.

13   98.  On information and belief, between February 7, 2021, until February 9, 2021, Defendants
14   SELLS, HOWARD, AARON, POLA, TERRELL, and DOES 1-30 only offered JONAS PARK
15   recreation time out of his cell once, during his entire five days in custody.

16   99.  On February 7, 2021, PARK requested medical attention because he was "Feeling Shaky."
17   On information and belief, PARK was exhibiting symptoms of opiate withdrawal, and required
18   immediate medical care. At about 3:02 p.m., Defendant LEWIS took JONAS PARK's vital signs,
19   and "encouraged fluids and provided Gatorade." With deliberate indifference to JONAS PARK's
20   obvious, serious medical needs and withdrawal symptoms, Defendant LEWIS failed to refer
21   PARK for higher-level care.

22   100.     On February 9, 2021, at 6:48 a.m., Defendant MAGAT again denied the Librium
23   order for PARK.

24   101.     On February 9, 2021, Defendants, ACSO Deputies POLA and AARON, and
25   Defendant Sheriff's Technician TERRELL, were responsible for the safety of inmates on the West
26   side of HU 23, where PARK was housed.

27
28
COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                                    33
*K.P. v. County of Alameda, et al.*
Case No.

102.     At all relevant times, Defendant TERRELL, the only staff person in the HU-23 Housing Control Point, had a clear and unobstructed view into PARK's cell.

103.     On February 9, 2021, at about 8:13 a.m., on information and belief, Defendant POLA went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

104.     On February 9, 2021, at about 8:24 a.m., on information and belief, Defendant AARON went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

105.     On February 9, 2021, at about 9:00 a.m., on information and belief, Defendant HOWARD went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

106.     On February 9, 2021, at about 9:09 a.m., on information and belief, Defendant POLA went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

107.     On February 9, 2021, at about 10:37 a.m., on information and belief, Defendant POLA went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

108.     At about 11:22 a.m., on information and belief, Defendant POLA went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

109.     At about 11:33 a.m., on information and belief, Defendant POLA went to PARK's cell, and PARK showed signs that he was physically suffering from withdrawal, was anxious, and was at risk of self-harm.

110.     At about 12:57 p.m., Defendant TERRELL told Defendant AARON that PARK was banging on his cell door. On information and belief, PARK expressed his frustration at not having received a tablet to make phone calls with for the past three days, and otherwise showed

1   signs that he was physically suffering from opiate withdrawal, was anxious, and was at risk of self-

2   harm.

3       111.        At about 2:20 p.m., on information and belief, Defendant POLA walked by

4   PARK's cell while doing a count, and he saw PARK "kneeling on the lower bunk facing away

5   from the door[.]" On information and belief, at that very moment, PARK was in the act of

6   committing suicide by means of placing his weight on a ligature tied to the top bunk. Failing to

7   recognize that PARK was in the process of asphyxiating himself, Defendant POLA did not check

8   on PARK by speaking with him or getting a closer look; instead, Defendant POLA continued to

9   "count" inmates before returning to the "West-wing Deputy office." On information and belief,

10  however, the ligature failed, so PARK requested a bedsheet from the correctional deputies.

11      112.        At 2:41 p.m., Defendant AARON gave PARK a bedsheet, an item that is commonly

12  used as a ligature device in jails.

13      113.        During this entire time, Defendant TERRELL failed to monitor PARK, into whose

14  cell he could clearly see.

15      114.        At about 2:57 p.m., Defendant AARON decided to do his own inmate count, and

16  saw PARK "slouched forward on his knees facing the rear of the cell on the bottom bunk," and

17  was able to see that PARK "had a bedsheet wrapped around his neck with the other end wrapped

18  around the upper bunk's frame." Defendant AARON summoned Defendant POLA.

19      115.        Defendant POLA would later admit that he could see that PARK "was kneeling on

20  the lower bunk roughly in the same position I had seen him at 1420 hours," and he "could see that

21  he was leaning forward, and his body weight was being suspended by the sheet."

22      116.        Defendant AARON grabbed PARK around the torso and lifted him up to reduce

23  pressure on his neck and to allow him to breathe. Defendant POLA used a seatbelt cutter to cut the

24  sheet, freeing PARK's neck. Defendant AARON dragged PARK out of the cell, and Defendant

25  POLA broadcast over SRJ's main radio channel that he needed Code-3 medical personnel to

26  respond for life-saving measures, which failed to revive him.

27

28  COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                                          35
    *K.P. v. County of Alameda, et al.*
    Case No.

117.     At 3:42 p.m., PARK was pronounced deceased. Minutes later, Defendant MAGAT approved the Librium prescription.

118.     The COUNTY coroner determined that PARK's cause of death was Asphyxia and Hanging. PARK's autopsy showed that he had Fentanyl in his system. On information and belief, Fentanyl is detectable in the system for 72 hours.

**VI.    AFTER JONAS PARK'S SUICIDE, DEFENDANTS' CONTINUED DELIBERATE INDIFFERENCE CAUSED CONTINUED SUICIDES AT THE SANTA RITA JAIL, THERE IS A DOJ INVESTIGATION, AND THE COUNTY ENTERS INTO A CONSENT DECREE REGARDING THE CONDITIONS THAT KILLED PARK**

119.     Several months after PARK's suicide, the second in-custody suicide of 2021 occurred at the Santa Rita Jail, on April 2, 2021.[36]

120.     On April 22, 2021, at the conclusion of a multi-year study, the Civil Rights Division of the U.S. Department of Justice provided formal notice to Defendant Alameda County Sheriff AHERN of the "alleged conditions that we have reasonable cause to belief violate the Constitution and federal law and the supporting facts giving rise to those violations."[37]

121. The Department of Justice concluded Santa Rita Jail fails to provide constitutionally adequate mental-health care to inmates with serious mental health needs, including those at risk of suicide," and that the Santa Rita Jail:

> fails to provide constitutionally adequate mental health treatment. The Jail's mental health program lacks many of the hallmarks of a constitutionally adequate system. Specifically, the Jail's current program fails to: provide adequate psychotherapy; provide adequate treatment planning, discharge planning, and programming; and properly treat and supervise suicidal prisoners. As a result, prisoners with serious mental health needs can experience worsening mental health conditions, repeated

---

[36] Lisa Fernandez, *Woman takes own life at Santa Rita Jail; some in custody only get 1 hour a week out of cell*, ktvu.com (April 9, 2019), https://www.ktvu.com/news/woman-takes-own-life-at-santa-rita-jail-some-in-custody-only-get-1-hour-a-week-out-of-cell

[37] United States Department of Justice, *Notice Regarding Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail* (Apr. 22, 2021), https://www.justice.gov/crt/case-document/file/1388891/download

cycling for acute care at John George, prolonged restrictive housing, and, at times, serious physical harm or death. From 2015 to 2019, at least 14 prisoners died by suicide in the Jail. Two other prisoners have died by suicide at the Jail within the last two months.[38]

122.    On October 14, 2021, Marlon Reyes committed suicide while he was housed alone in HU 23 at the Santa Rita Jail.[39]

123.    On or about February 7, 2022, the United States District Court for the Northern District of California approved a consent decree entered into by Defendant COUNTY to remedy the unconstitutional mental-health-related conditions of confinement that Plaintiffs contend caused PARK's death. *See Babu v. County of Alameda, et al.*, No. 5:18-cv-07677-NC (N.D. Cal.), Dkt. 266–1, 5–83.

124.    PARK's death was the proximate result of the COUNTY and WELLPATH Defendants' deliberate indifference to his serious medical needs, and of the COUNTY's deliberate indifference to his serious mental-health needs, as set forth above.

125.    PARK's death was also the proximate result of Defendant COUNTY's failure to reasonably train and supervise the jail deputies tasked with screening, admitting, observing, monitoring, and protecting PARK. These substantial failures reflect Defendant COUNTY's policies of implicitly or directly ratifying and/or authorizing the deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline deputies employed by Defendants COUNTY and AHERN, in deliberate indifference to inmates' serious medical and mental-health needs.

126.    PARK's death was also the proximate result of the COUNTY Defendants' failures to reasonably staff, train, supervise, and equip their mental-health staff in the proper and reasonable screening, assessment, and care of inmates needing mental-health care, including PARK.

127.    PARK's death was also the proximate result of the WELLPATH Defendants' failure to reasonably staff, train, supervise, and equip their medical staff in the proper and

---

[38] *Id.*
[39] Lisa Fernandez, *Suicide at Santa Rita jail in quarantine intake unit*, ktvu.com (Oct. 21, 2021), https://www.ktvu.com/news/suicide-at-santa-rita-jail-in-quarantine-intake-unit

reasonable screening, assessment, and care of inmates needing emergency medical treatment; referral to mental-health treatment; and detoxification from drugs, including Fentanyl and opiates.

128.     At all material times, and alternatively, the actions and omissions of each and every Defendant were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedent's and Plaintiffs' rights; done with actual malice; grossly negligent, and objectively unreasonable.

129.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, to the extent permitted and pleaded by the various legal claims set forth below, Plaintiffs sustained the following injuries and damages, past and future, among others:

a.     Wrongful death of JONAS PARK, pursuant to California Code of Civil Procedure § 377.60, *et seq.*;

b.     Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to California Code of Civil Procedure § 377.60 *et seq.*;

c.     JONAS PARK's hospital and medical expenses, pursuant to California Code of Civil Procedure § 377.20, *et seq.*;

d.     JONAS PARK's coroner's fees and funeral and burial expenses, pursuant to California Code of Civil Procedure § 377.20 *et seq.*;

e.     Violation of JONAS PARK's constitutional rights, pursuant to California Code of Civil Procedure § 377.20 *et seq.*, and federal civil-rights law;

f.     JONAS PARK's pre-death pain, suffering, or disfigurement, pursuant to state law (Cal. Code Civ. Proc. § 377.34);

g.     JONAS PARK's loss of life, pursuant to federal civil-rights law;

h.     JONAS PARK's conscious pain and suffering, pursuant to federal civil-rights law;

i.     All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

38

1

2

**CAUSES OF ACTION**

3

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 Fourteenth Amendment—Deliberate Indifference to Serious Medical Needs/Failure to Protect)**
**PLAINTIFF K.P. AGAINST DEFENDANTS SOLOPOW, GERBACIO, HOWARD, AARON, POLA, TERRELL, MAGAT, MOLITORISZ, HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, and DOES 1-30**

4

5

6

7

130.     Plaintiffs reallege each and every paragraph in this Complaint, as though fully set

8

forth here.

9

131.     By the actions and omissions described above, Defendants deprived JONAS

10

PARK, through Plaintiff K.P., of the following clearly-established and well-settled constitutional

11

rights that are protected by the Fourteenth Amendment to the United States Constitution:

12

a.     JONAS PARK's right to needed medical/psychiatric, mental-health care while in

13

custody;

14

b.     JONAS PARK's right to be protected while in custody.

15

132.     Defendants subjected JONAS PARK to their wrongful conduct, depriving JONAS

16

PARK of the rights described herein, knowingly, maliciously, and with conscious and reckless

17

disregard for whether the rights and safety of JONAS PARK and others would be violated by their

acts and/or omissions.

18

19

133.     As a direct and proximate result of Defendants' acts and/or omissions as set forth

20

above, JONAS PARK, through Plaintiff K.P., sustained injuries and damages, as set forth above,

at ¶ 129.

21

22

134.     The conduct of Defendants entitles Plaintiff K.P. to punitive damages and penalties

23

allowable under 42 U.S.C. § 1983 and California law. Plaintiff K.P. does not seek punitive

damages directly against Defendant COUNTY.

24

25

135.     Plaintiff K.P. is also entitled to reasonable costs and attorneys' fees, under 42

26

U.S.C. § 1988, and other applicable California codes and laws.

//

27

28

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 First and Fourteenth Amendments—Interference with Familial Association)
### PLAINTIFFS AGAINST DEFENDANTS SOLOPOW, GERBACIO, HOWARD, AARON, POLA, TERRELL, MAGAT, MOLITORISZ, HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, and DOES 1-30

136.     Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

137.     By the actions and omissions described above, Defendants deprived JONAS PARK and Plaintiffs of the following clearly established and well-settled constitutional rights that are protected by the First and Fourteenth Amendments to the U.S. Constitution:

a.     The right to be free from wrongful government interference with familial relationships, and Plaintiffs' right to companionship, society, and support.

138.     Defendants subjected JONAS PARK and Plaintiffs to their wrongful conduct, depriving JONAS PARK and Plaintiffs of the rights described herein, and they did so knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent or Plaintiffs would be violated by their acts and/or omissions.

139.     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs sustained injuries and damages, as set forth in ¶ 129, above.

140.     The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and California law. Plaintiffs do not seek punitive damages directly against Defendant COUNTY.

141.     Plaintiffs are also entitled to reasonable costs and attorneys' fees, under 42 U.S.C. § 1988, and other applicable California codes and laws.

//

//

//

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

40

**THIRD CAUSE OF ACTION**
**(42 U.S.C. § 1983 - *Monell* Liability)**
**PLAINTIFF K.P. AGAINST DEFENDANTS COUNTY and WELLPATH**

142.      Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

143.      The unconstitutional actions and/or omissions of the individual Defendants, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY and/or WELLPATH, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY and/or WELLPATH, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officials for Defendant COUNTY and/or Defendant WELLPATH:

a.      To deny inmates access to timely, appropriate, competent, and necessary care for serious medical and psychiatric needs, requiring such inmates in crisis to remain untreated in jail, instead of providing for their urgent, emergency medical needs;

b.      To allow and encourage inadequate and incompetent medical and mental-health care for inmates;

c.      To contract for obviously inadequate medical and psychiatric care for inmates, including creating financial incentives for WELLPATH staff not to send inmates with emergency medical needs to a hospital;

d.      To allow, encourage, and require unlicensed, incompetent, inadequately trained, and/or inadequately supervised staff to assess inmates' medical and psychiatric condition, needs, and treatment, including to decide whether or not to provide inmates with necessary care and hospitalization;

e.      To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill persons or persons in a medical crisis;

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

41

f.      To fail to have an adequate and accepted suicide risk-assessment tool which can assist staff in the appropriate determination of suicide risk, which changes over time;

g.      To fail to have individual treatment plans for inmates with serious mental-health needs;

h.      To fail to have proper security checks on inmates, instead of security checks that are untimely and cursory;

i.      To fail to conduct adequate morbidity or suicide-reviews, or post-incident internal-affairs investigations of the in-custody suicides, instead finding that the conduct of all COUNTY employees always comports with policy;

j.      To cover up violations of constitutional rights by any or all of the following:

    i.      By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical and psychiatric care at the Santa Rita Jail;

    ii.      By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct COUNTY and WELLPATH employees; and

    iii.      By allowing, tolerating, and/or encouraging COUNTY and WELLPATH staff to: fail to file complete and accurate reports; file false reports; make false statements; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

k.      To allow, tolerate, and/or encourage a "code of silence" among law-enforcement officers, sheriff's office personnel, and WELLPATH staff at the jail, whereby an officer, member of the sheriff's office, or WELLPATH employee does not provide adverse information against a fellow officer, member of the ACSO, or WELLPATH staff;

l.      To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (k) above, with

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

42

1    deliberate indifference to the rightsand safety of Decedent PARK, of Plaintiffs, and of the

2    public, and in the face of an obvious need for such policies, procedures, and training

3    programs.

4        144.    Defendants COUNTY and WELLPATH, through their employees and agents, and

5    through their policy-making supervisors, AHERN, SELLS, TRIBBLE, HALLMAN, DOMINICS,

6    PANGBURN, MAGAT, and MOLORISZ, and remaining DOES 1-30, failed to properly hire, train,

7    instruct, monitor, supervise, evaluate, investigate, and discipline Defendants SOLOPOW,

8    GERBACIO, HOWARD, AARON, POLA, TERRELL, HIRSCH, LEWIS, MAND, RAMILO,

9    BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, DOES 1-

10   30, and other COUNTY and WELLPATH personnel, with deliberate indifference to Plaintiffs',

11   JONAS PARK's, and others' constitutional rights, which were thereby violated, as described

12   above.

13       145.    The unconstitutional actions and/or omissions of Defendants SOLOPOW,

14   GERBACIO, HOWARD, AARON, POLA, TERRELL, HIRSCH, LEWIS, MAND, RAMILO,

15   BARRON, FERRER, WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, and DOES

16   1-30, as described above, were approved, tolerated, and/or ratified by policymaking officials for

17   the COUNTY, including Defendants AHERN, TRIBBLE, and SEAL; as well as by WELLPATH

18   and WELLPATH executives and managers HALLMAN, DOMINICS, PANGBURN, MAGAT,

19   and MOLITORISZ. Plaintiff is informed and believes, and thereon alleges, that the details of this

20   incident—and all the Santa Rita Jail completed and attempted suicides preceding it—have been

21   revealed to the authorized policymakers within the COUNTY and WELLPATH, and that such

22   policymakers have direct knowledge of the fact that the death of JONAS PARK, as well as all of

23   the other suicide deaths at Santa Rita Jail between January 2014 and January 2019 preceding this

24   tragic death, were the result of deliberate indifference to his and others' serious medical needs.

25   Notwithstanding this knowledge, the authorized policymakers within the COUNTY and

26   WELLPATH have approved of the conduct and decisions of these individual Defendants and

27

28   COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                                          43
     *K.P. v. County of Alameda, et al.*
     Case No.

DOES 1-30 in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, which resulted in the death of JONAS PARK. By so doing, the authorized policymakers within the COUNTY and WELLPATH have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants. Furthermore, Plaintiff is informed and believes, and thereupon alleges, that Defendants AHERN, TRIBBLE, SEAL, as well as Defendants HALLMAN, DOMINICS, PANGBURN, MAGAT, and MOLITORISZ, and other policy-making officials for the COUNTY and WELLPATH, were and are aware of a pattern of misconduct and injury caused by COUNTY and WELLPATH employees that is similar to the conduct of Defendants described herein, but failed to discipline culpable employees, and failed to institute new procedures and policies within the COUNTY and WELLPATH.

146.     The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY and WELLPATH were a moving force and/or a proximate cause of the deprivations of Plaintiffs' clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above, at ¶ 129.

147.     Defendants subjected Plaintiffs to their wrongful conduct, depriving JONAS PARK and Plaintiffs of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of JONAS PARK, Plaintiffs, and others would be violated by their acts and/or omissions.

148.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants COUNTY and WELLPATH, as described above, JONAS PARK suffered constitutional violations, pre-death pain and suffering, serious injuries, and death, and Plaintiffs suffered their own, personal First and Fourteenth Amendment violations and are entitled to damages, penalties, costs, and attorneys' fees against Defendants COUNTY and

WELLPATH, as set forth above, in ¶ 129, including punitive damages against Defendant WELLPATH.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 Supervisory Liability)
### PLAINTIFF K.P. AGAINST DEFENDANTS AHERN, TRIBBLE, SEAL, SELLS, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1–30

149.    Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

150.    At all material times, Defendants AHERN, TRIBBLE, SEALS, SELLS, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30 had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the COUNTY and WELLPATH

151.    Defendants AHERN, TRIBBLE, SEALS, SELLS, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30 failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the employees of their respective agencies, including the other individual Defendants and other COUNTY and WELLPATH personnel, with deliberate indifference to Plaintiffs', Decedent's, and others' constitutional rights, which were thereby violated, as described above.

152.    As supervisors, Defendants AHERN, TRIBBLE, SEALS, SELLS, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30 each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of JONAS PARK, as well as the rights of Plaintiffs. Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's and Plaintiffs' rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive JONAS PARK and Plaintiffs of rights; OR knew his or her subordinates were engaging in acts likely to deprive

1  Decedent and Plaintiffs of rights, and failed to act to prevent his or her subordinate from engaging
2  in such conduct; OR disregarded the consequence of a known or obvious training deficiency that
3  he or she must have known would cause subordinates to violate Decedent's and Plaintiffs' rights,
4  and which in fact did cause the violation of Decedent's and Plaintiffs' rights. Furthermore, each of
5  these supervising Defendants is liable in their failures to intervene in their subordinates' apparent
6  violations of Decedent's and Plaintiffs' rights.

7      153.    The unconstitutional customs, policies, practices, and/or procedures of Defendants
8  COUNTY, and WELLPATH, as stated herein, were directed, encouraged, allowed, and/or ratified
9  by policymaking officials for Defendant COUNTY and CFMG, AHERN, TRIBBLE, SEALS,
10 SELLS, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30, with
11 deliberate indifference to Plaintiffs', Decedent's, and others' constitutional rights, which were
12 thereby violated as described above

13     154.    The unconstitutional actions and/or omissions of Defendants, as described above,
14 were approved, tolerated, and/or ratified by policymaking officials for the COUNTY and for
15 WELLPATH. Plaintiffs are informed and believe, and thereon allege, that the details of this
16 incident have been revealed to Defendants AHERN, TRIBBLE, SEALS, SELLS, HALLMAN,
17 DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30, and that such Defendant-
18 policymakers have direct knowledge of the fact that the death of JONAS PARK was not justified
19 or necessary, but represented deliberate indifference to his serious medical needs, as set forth
20 above. Notwithstanding this knowledge, on information and belief, AHERN, TRIBBLE, SEALS,
21 SELLS, HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30 have
22 approved and ratified of the conduct and decisions of SOPOLOW, GERBACIO, HOWARD,
23 AARON, POLA, TERRELL, HIRSCH, LEWIS, MAND, RAMILO, BARRON, FERRER,
24 WILLIAMS, EARL, LUZ, SIDHU, SHREESH, TADEO, and DOES 1-30 in this matter, and have
25 made a deliberate choice to endorse such conduct and decisions, and the basis for them, that
26 resulted in the death of JONAS PARK.  By so doing, the supervisory Defendants have shown

27
28

1    affirmative agreement with the individual Defendants' actions, and have ratified the
2    unconstitutional acts of the individual Defendants.  Furthermore, Plaintiffs are informed and
3    believe, and thereupon alleges, that Defendants AHERN, TRIBBLE, SEALS, SELLS,
4    HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30, and other
5    policy-making officials for the COUNTY and WELLPATH, were and are aware of a pattern of
6    misconduct and injury caused by COUNTY and WELLPATH employees similar to the conduct of
7    Defendants described herein, but failed to discipline culpable law-enforcement officers and
8    employees and failed to institute new procedures and policy within the COUNTY and
9    WELLPATH.

10        155.    The aforementioned customs, policies, practices, and procedures; the failures to
11    properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and
12    discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful
13    conduct of Defendants AHERN, TRIBBLE, SEALS, SELLS, HALLMAN, DOMINICS,
14    PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30 were a moving force and/or a proximate
15    cause of the deprivations of Decedent's and Plaintiffs' clearly established and well-settled
16    constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above, at ¶ 129.

17        156.    Defendants subjected JONAS PARK and Plaintiffs to their wrongful conduct,
18    depriving JONAS PARK and Plaintiffs of the rights described herein, knowingly, maliciously, and
19    with conscious and reckless disregard for whether the rights and safety of JONAS PARK,
20    Plaintiffs, and others would be violated by their acts and/or omissions.

21        157.    As a direct and proximate result of the unconstitutional actions, omissions, customs,
22    policies, practices, and procedures of Defendants AHERN, TRIBBLE, SEALS, SELLS,
23    HALLMAN, DOMINICS, PANGBURN, MAGAT, MOLITORISZ, and DOES 1-30, as described
24    above, Plaintiffs sustained serious and permanent injuries, and are entitled to damages, penalties,
25    costs, and attorneys' fees, as set forth above, in ¶ 129.

**FIFTH CAUSE OF ACTION**
**(Violation of Civil Code § 52.1 – Bane Act)**
**AGAINST DEFENDANTS AHERN, TRIBBLE, SEAL, SELLS, SOLOPOW, GERBACIO,**
**HOWARD, AARON, POLA, TERRELL, HALLMAN, DOMINICS, PANGBURN,**
**MAGAT, MOLITORISZ, HIRSH, LEWIS, MAND, RAMILO, BARRON, FERRER,**
**WILLIAMS, EARL, LUZ, SIDHU, SHREESH, SINGH, TADEO, and DOES 1–30**

158.     Plaintiffs reallege each and every paragraph in this complaint, as though fully set forth here.

159.     Plaintiff K.P. brings the claims in this cause of action as survival claims permissible under California law, including California Code of Civil Procedure. §§ 377.20 *et. seq.*

160.     By their acts, omissions, customs, and policies, each Defendant acting in concert/conspiracy, as described above, while JONAS PARK was in custody, and by threat, intimidation, and/or coercion, interfered with, and/or attempted to interfere with, and thereby violated Plaintiffs' rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

a.     The right to be free from objectively unreasonable treatment and deliberate indifference to JONAS PARK's serious medical needs while in custody as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution and by Article 1, § 7 of the California Constitution, as well as other provisions of the California Constitution;

b.     The right to be free from wrongful government interference with familial relationships, and Plaintiffs' right to companionship, society, and support, under both the United States Constitution and the California Constitution;

c.     The right to be protected while in custody, as secured by the Fourteenth Amendment;

d.     The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1; and

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

48

e.      The right to protection from bodily restraint, harm, or personal insult, assecured by California Civil Code § 43.

161.      Defendants' violations of Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[40] Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violations as described above, Defendants violated the Bane Act by the following conduct constituting threat, intimidation, or coercion:

a.      With deliberate indifference to Decedent's serious medical needs, suffering, and risk of grave harm and self-harm, including death, depriving Decedent of necessary, life-saving care for his medical and/or psychiatric needs;

b.      Subjecting Decedent to ongoing violations of his rights to prompt care for his serious medical and psychiatric needs over days, causing immense and needless suffering, intimidation, coercion, and threats to his life and well-being;

162.      The threat, intimidation, and coercion described herein were not necessary or inherent in Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

163.      All of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

164.      Each Defendant committed their violations with the specific intent and purpose within the meaning of the Bane Act, by acting with a reckless disregard to the Decedent's and Plaintiffs' rights, and of the interests protected by those rights.

165.      Defendants COUNTY and WELLPATH are vicariously liable for the violations of rights by their employees and agents.

---

[40] *See Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639,at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013)).

166.        As a direct and proximate result of Defendants' violation of California Civil Code § 52.1, Plaintiffs sustained injuries and damages, and against each and every Defendant are entitled to relief, as set forth above, at ¶ 129, including punitive damages against all individual Defendants and WELLPATH, and all damages allowed by California Civil Code §§ 52, 52.1, and California law, including, but not limited to, costs attorneys' fees, three times actual damages, and civil penalties.

### SIXTH CAUSE OF ACTION
### (Article I, Section 7 of the California Constitution—Survival Claim)
### PLAINTIFF K.P. AGAINST ALL DEFENDANTS

167.        Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

168.        Plaintiff K.P. brings the claims in this cause of action as survival claims, permissible under California law, including California Code of Civil Procedure § 377.20 *et. seq.*

169.        Placement in isolation imposes an atypical, substantial, and different hardship on the inmate in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. By their policies and practices described above, Defendants subjected Decedent to a substantial risk of harm due to the denial of due process in relation to classification and housing decisions, including placement in isolation or restrictive housing, and inadequate protection from the harmful effects of Fentanyl withdrawal and the associated suicide risk. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their individual capacities, and are the proximate cause of Decedent's deprivation of rights, as secured by the California Constitution, Article I, Section 7.

170.        Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

171.        As a proximate result of the foregoing wrongful acts, the Decedent sustained injuries and damages, as set forth above, at ¶ 129.

172.     In committing the acts alleged above, Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for the rights, safety, and emotional well-being of Decedent, and by reason thereof, Decedent is entitled to punitive damages against these individual defendants in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Article I, Section 17 of the California Constitution—Survival Claim)**
<u>**PLAINTIFF K.P. AGAINST DEFENDANT COUNTY and ALL INDIVIDUAL DEFENDANTS**</u>

173.     Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

174.     Plaintiff K.P. brings the claims in this cause of action as survival claims, permissible under California law, including California Code of Civil Procedure § 377.20 *et. seq.*

175.      By their policies and practices described above, Defendants subjected Decedent to a substantial risk of serious harm and injury from the harmful and inhumane effects of prolonged isolation, the denial of due process in relationship to classification and housing decisions, inadequate mental health care and inadequate protection from the serious health consequences of opiate withdrawal. Defendants further subjected Decedent to a substantial risk of serious harm and injury from the way Defendants use safety cells and isolation, including harm caused by the conditions of confinement which provide for inadequate physical exercise and programming, inadequate mental health treatment, and extreme social isolation and environmental deprivation. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Decedent's deprivation of rights secured by the California Constitution, Article I, Section 17.

176.     Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

177.     As a proximate result of the foregoing wrongful acts, the Decedent sustained injuries and damages, as set forth above, at ¶ 129.

178.     In committing the acts alleged above, Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for the rights, safety, and emotional well-being of Decedent, and by reason thereof, Decedent is entitled to punitive damages against these individual defendants in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
### (Negligence—Wrongful Death and Survival Claim)
### PLAINTIFF K.P. AGAINST DEFENDANTS COUNTY, AHERN, SELLS, SOLOPOW, GERBACIO, HOWARD, AARON, POLA, TERRELL, HALLMAN, DOMINICS, and DOES 1–30

179.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

180.     At all times, Defendants AHERN, SELLS, SOLOPOW, GERBACIO, HOWARD, AARON, POLA, TERRELL, HALLMAN, DOMINICS, and DOES 1-30, owed Plaintiff and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

181.     At all times, these Defendants owed Plaintiff and Decedent the duty to act with reasonable care.

182.     These general duties of reasonable care and due care owed to Plaintiff and Decedent by these Defendants include but are not limited to the following specific obligations:

a.     To refrain from unreasonably creating danger or increasing Decedent's risk of harm, and his life-threatening medical and/or psychiatric emergency;

b.     To use generally accepted law-enforcement procedures and tactics that are reasonable and appropriate to monitor Decedent, a mentally ill person in medical crisis with serious medical needs, to protect him from harm;

c.     To refrain from abusing their authority granted them by law;

d.     To refrain from violating Decedent's rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protectedby law.

183.     Defendants, through their acts and omissions, breached each and every one of the aforementioned duties owed to Decedent.

184.     Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code section 815.2.

185.     As a direct and proximate result of these Defendants' negligence, Plaintiff and Decedent sustained injuries and damages, and against each and every Defendant named in this cause of action in their individual capacities are entitled to relief as set forth above at ¶ 129, including punitive damages against such individual Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

   a.  Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

   b.  Punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable;

   c.  All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

   d.  Such further relief, according to proof, that this Court deems appropriate and lawful.

## **JURY TRIAL DEMAND**

Plaintiffs hereby respectfully demand a jury trial, pursuant to Federal Rule of Civil Procedure 38, for all claims for which a jury is permitted.

Dated: March 22, 2022

**LAW OFFICE OF SANJAY S. SCHMIDT**
-and-
**HELM LAW OFFICE, PC**

*/s/ T. Kennedy Helm, IV*
By: T. Kennedy Helm, IV
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*K.P. v. County of Alameda, et al.*
Case No.

54